IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BRANDON H., )
)
Plaintiff, )
)
v. ) 1:24CV393
)
FRANK BISIGNANO, )
Commissioner of Social Security,[1] )
)
Defendant. )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Brandon H. ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on August 11, 2021, alleging a disability onset date of May 20, 2021, in both applications. (Tr. at 10, 244-64, 268-71, 273-79.)[2] His applications were denied initially (Tr. at 91-112, 140-49) and upon reconsideration.

---

[1] The United States Senate confirmed Frank Bisignano as the Commissioner of Social Security on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #3].

(Tr. at 113-34, 159-68.) Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 169-70.) On September 25, 2023, Plaintiff, along with his non-attorney representative, attended the subsequent telephonic hearing, at which both Plaintiff and an impartial vocational expert testified. (Tr. at 10, 33-86.) Following this hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 20), and on March 19, 2024, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-6.)

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (quotation and brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "[I]t consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 *et seq.*, provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 *et seq.*, provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

3

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the [claimant] is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work[,]" as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since May 20, 2021, his alleged disability onset date. The ALJ therefore concluded that Plaintiff met his burden at step one of the sequential evaluation process. (Tr. at 12.) At step two, the ALJ further determined that schizophrenia was Plaintiff's sole severe impairment. (Tr. at 13.) The ALJ found at step three that this impairment did not meet or equal a disability listing. (Tr. at 13-14.) The ALJ therefore assessed Plaintiff's RFC and determined that he could perform a full range of work at all exertional levels, but with the following, non-exertional limitations:

> [Plaintiff] remains capable of understanding, remembering, and carrying out simple work-related instructions; he can complete simple work-related tasks and make simple work-related decision in an environment requiring no more than occasional changes in work setting and duties; he can concentrate and persist with such tasks for two-hour increments; he can occasionally interact with

5

Case 1:24-cv-00393-CCE-JEP    Document 12    Filed 08/19/25    Page 5 of 19

supervisors and coworkers, and can never interact with the public as part of his assigned work duties.

(Tr. at 14.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that all of Plaintiff's past relevant work exceeded his RFC. (Tr. at 18.) However, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in significant numbers in the national economy. (Tr. at 19.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 19-20.)

Plaintiff now contends that substantial evidence fails to support the ALJ's analysis of the opinion evidence relating to Plaintiff's mental health. In particular, Plaintiff challenges the ALJ's treatment of medical opinion evidence provided by Plaintiff's treating psychiatrist, Dr. Daniel Wurzelmann, and the State agency psychological consultants, Chang-Wuk Kang, M.D., and Melissa Parnell, Ph.D.

> Under the applicable regulations for claims filed on or after March 27, 2017,
>
> [The ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. . . .
>
> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical

>       sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.
>
>   (3) <u>Relationship with the claimant</u> . . . [which includes]: (i) Length of the treatment relationship. . . (ii) Frequency of examinations. . . . (iii) Purpose of the treatment relationship. . . . (iv) Extent of the treatment relationship. . . [and] (v) Examining relationship. . . .
>
>   (4) <u>Specialization</u>. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.
>
>   (5) <u>Other factors</u>. . . . This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. . . .

20 C.F.R. § 404.1520c(a) and (c). The regulations also require decision-makers to "articulate in [their] . . . decision[s] how persuasive [they] find all of the medical opinions . . . in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). Although all of the factors listed in paragraphs (c)(1) through (c)(5) of § 404.1520c should be considered in making this determination, the regulations specifically provide that the most important factors when evaluating the persuasiveness of an opinion are the first two: supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 404.1520c(c)(1)-(c)(2). Therefore, paragraph (b) further provides that ALJs "will explain how [they] considered the supportability and consistency factors for a medical source's medical opinions . . . in [the] determination or decision." 20 C.F.R. § 404.1520c(b)(2). Express discussion of the remaining factors is not required. <u>See</u> 20 C.F.R. § 404.1520c(b)(3); <u>see also</u> <u>Revisions to Rules Regarding the Evaluation of Medical Evidence</u>, 82 FR 5844-01 (Jan. 18, 2017) (explaining that the final rules in § 404.1520c "require our [ALJs]

to consider all of the factors" in § 404.1520c(c) "for all medical opinions and, at a minimum, to articulate how they considered the supportability and consistency factors" in determining persuasiveness). In other words, §§ 404.1520c(b)–(c) define the "minimum level of articulation" an ALJ must include in her written decision "to provide sufficient rationale for a reviewing . . . court." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F.R. 5844-01; see also Drumgold v. Comm'r of Soc. Sec., 144 F.4th 596 (4th Cir. 2025).

Here, as set out in the administrative decision, both Dr. Kang and Dr. Parnell opined that Plaintiff "can understand, remember, and carry out very short and simple instructions and can persist with simple routine tasks, and that while he may have difficulty interacting with the public, he can interact with supervisors and coworkers and adjust to stress consistent with simple, routine tasks." (Tr. at 17.) The ALJ found these opinions persuasive and "agree[d] that [Plaintiff] can perform some simple tasks with reduced stress and no public contact." (Tr. at 17.) In doing so, he noted that

> Drs. Kang and Parnell supported their opinions with a detailed review of the evidence available to them, citing to the generally stable and intact mental status findings and reported activities of daily living that contradict [Plaintiff's] allegations. These findings remain consistent with the record available at the hearing level, which documents improvement with medication compliance and reduced drinking, such that [Plaintiff] is able to work part-time, volunteer, and engage with others.

(Tr. at 17 (citing Tr. at 694, 707, 710, 713, 725, 785).) The ALJ further asserted that Plaintiff's mental status findings have remained stable since Dr. Kang and Dr. Parnell issued their findings in January and August 2022, respectively. (Tr. at 17 (citing Tr. at 709, 715, 728, 746, 773-74).)

Although the ALJ found the State agency opinions supported by and consistent with the evidence without exception, Plaintiff correctly notes that the ALJ did not adopt them in full when assessing Plaintiff's RFC. Specifically, the ALJ found Plaintiff "capable of understanding, remembering, and carrying out **simple** work-related instructions" rather than capable of understanding, remember, and carrying out "**very short and simple** instructions" as found by Drs. Kang and Parnell. (Compare Tr. at 14 with Tr. at 107, 119.) This small change appears innocuous at first blush. However, it has a significant impact at step five of the sequential analysis, as the inclusion of "very short and simple" instructions in Plaintiff's RFC would apparently preclude all of the jobs identified by the vocational expert at that step.

In Pearson v. Colvin, 810 F.3d 204, 210 (4th Cir. 2015), the Fourth Circuit recognized that an ALJ has an affirmative "duty to make an independent identification of apparent conflicts" between VE testimony and the provisions of the Dictionary of Occupational Titles ("DOT"), regardless of whether a conflict is identified by the VE. Pearson, 810 F.3d at 208-09, 210. In Pearson, because of the apparent conflict between the VE's testimony and the DOT, remand was required so that the ALJ could elicit a reasonable "explanation from the expert" before relying on the expert's testimony. Id. at 208-09, 211. In 2019, in Thomas v. Berryhill, the Fourth Circuit applied the principles articulated in Pearson as they related to the DOT's Reasoning Development scale. See Thomas v. Berryhill, 916 F.3d 307, 314 (4th Cir. 2019). That scale has six levels—Level 1 requires the least reasoning ability, and Level 6

9

requires the most reasoning ability. See DOT, App. C, 1991 WL 688702.[5] The DOT assigns a Reasoning Development Level to each occupation identified therein. In Thomas, the vocational expert identified three jobs, all with a Reasoning Level of 2, "requir[ing] employees to 'carry out detailed but uninvolved written or oral instructions.' By comparison, Thomas's RFC limit[ed] her to jobs that involve only 'short, simple instructions.'" Thomas, 916 F.3d at 314 (internal citations omitted). The Fourth Circuit found

> that Thomas, being limited to short, simple instructions, may not be able to carry out detailed but uninvolved instructions. This is not a categorical rule—some instructions, particularly if they are well-drafted, may be simultaneously short, simple, detailed, and uninvolved. Even so, the conflict between Thomas's limitation to short, simple instructions and the VE's testimony that Thomas could perform jobs that include detailed but uninvolved instructions is as apparent as the conflict we identified in Pearson. Since we held that an apparent conflict existed in Pearson, we are satisfied that one exists in this case, too. We remand so that the ALJ can resolve the conflict in accordance with the Administration's regulations.

Id. at 314 (footnote omitted). Consequently, in Thomas, the Fourth Circuit held that there was an apparent conflict between jobs requiring Level 2 reasoning and a limitation to "short, simple instructions." Id. Moreover, in Lawrence v. Saul, 941 F.3d 140, 143 (4th Cir. 2019),

---

[5] The Reasoning Levels relevant to this case, Level 1 and Level 2, are defined as follows:

LEVEL 2

Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

LEVEL 1

Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

U.S. Dept. of Labor, DOT, App. C, 1991 WL 688702.

the Fourth Circuit clarified that the conflict in such cases results from the restriction to "short" instructions, rather than the simplicity of the instructions or tasks:

> "Short" is inconsistent with "detailed" because detail and length are highly correlated. Generally, the longer the instructions, the more detail they can include. In contrast, the [ALJ] found that Lawrence could perform jobs limited to "simple, routine repetitive tasks of unskilled work." There is no comparable inconsistency between Lawrence's [RFC] . . . and Level 2's notions of "detailed but uninvolved . . . instructions" and tasks with "a few [ ] variables."

Id. (citations omitted). In the present case, the consultants' opined limitation to "very short" instructions further emphasizes Plaintiff's inability to understand, remember, and carry out detailed instructions, which would create an apparent conflict with the DOT with respect to the jobs identified by the ALJ, which all involve Level 2 reasoning.

Of course, the ALJ did not include the consultants' limitation to "very short" instructions in the RFC, so no apparent conflict arose. However, Plaintiff raises this issue to highlight the impact of the ALJ's omission in evaluating the opinion evidence. Both State agency consultants opined that Plaintiff would "have difficulty in following detailed instructions," and therefore required greater limitations in this area, specifically limited to "very short and simple instructions." (Tr. at 107, 119.) The ALJ accepted these opinions and presented no reasons for his departure from the consultants' findings. Moreover, the only other medical opinion evidence, that of Dr. Wurzelmann, concurred with the consultants on this point. (See Tr. at 604-05, 607.) The Court acknowledges that, in finding a medical source's opinion persuasive, an ALJ is not required to adopt every facet of that opinion. See Tranter v. Kijakazi, No. 1:20-CV-280-MOC, 2021 WL 5018699, at *7 (W.D.N.C. Oct. 28, 2021) (explaining that, "where an ALJ [gave] a medical opinion 'great weight,' [the ALJ was] not obliged to adopt the opinion in its entirety or 'give [it] controlling weight' when examining this

issue under the prior [pre-2017] regulations," and that "[t]he same logic holds when an ALJ finds a medical opinion or prior administrative medical finding 'persuasive' under the revised regulations.") (internal citations and some internal quotation marks omitted). However, where, as here, the ALJ, without explanation or evidentiary support, omits a limitation opined by all of the claimant's medical sources and, in doing so, significantly decreases the restrictiveness of that claimant's RFC, substantial evidence fails to support the ALJ's findings. In short, the ALJ in this case improperly substituted his own findings for those of the medical sources without any explanation. Further, that omission cannot be considered harmless, as all three of the jobs identified and relied upon by the ALJ at step five require a Reasoning Level of 2, and therefore an ability to understand and carry out detailed but uninvolved instructions. (Tr. at 19, 80-83 (citing DOT 369.687-026, 1991 WL 673074; DOT 323.687-010, 1991 WL 672782; DOT 920.587-018, 1991 WL 687916).) Therefore, remand is required so that the ALJ can explain the decision to not include the limitation to "very short" instructions, reflected in all of the medical opinions, including Drs. Kang and Parnell, relied on by the ALJ, or alternatively if that limitation is included in the RFC, address the apparent conflict with the DOT for the identified occupations with a Reasoning Level 2.

In addition to the above error, the ALJ's treatment of Dr. Wurzelmann's opinions provides an additional basis for remand. As set out in the administrative decision, Dr. Wurzelmann provided two medical opinions during the relevant time period:

> On September 5, 2021, Dr. Wurzelmann submitted a statement opining that [Plaintiff] has no useful ability to function in maintaining regular attendance, being punctual, and sustaining an ordinary routine, and that he is unable to meet competitive standards in remembering work-like procedures, carrying out even very short and simple instructions, maintaining attention for two-hour segments, working in coordination with others without being unduly distracted,

12

completing a normal workday without interruption from symptoms, and performing at a consistent pace without an unreasonable number of breaks. He is unable to meet competitive standards in semiskilled and skilled work. Dr. Wurzelmann further opined that [Plaintiff] has extreme limitations in remembering information, concentrating, and maintaining pace, with other marked limitations, and that he will be absent more than four days per month. In support of this opinion, Dr. Wurzelmann stated that [Plaintiff's] symptoms are managed with risperidone but that he tends to decompensate when he misses it, that he is frequently quite disorganized and misses appointments, that he often forgets medication changes, and that he sometimes misinterprets everyday events in a way that he feels threatened, bordering on paranoia.

Again, on September 18, 2023, Dr. Wurzelmann submitted a statement opining that [Plaintiff] has [] marked or extreme limitation[s] in all "paragraph B" criteria areas, and with respect to even very short and simple instructions, maintaining attention and concentration, sustaining a routine, and getting along with coworkers[.]

(Tr. at 16-17) (citations omitted).

The ALJ found these statements unpersuasive. In doing so, he noted several factors, including Dr. Wurzelmann's "own treatment notes, which document some deficits in insight and concentration, but otherwise intact memory, attention, and concentration, and normal behavior." (Tr. at 17 (citing Tr. at 709, 715, 728, 746, 773-74).) The ALJ further noted that, at multiple appointments with Dr. Wurzelmann, Plaintiff reported "generally doing well with no major concerns" (Tr. at 17(citing Tr. at 694, 702, 710, 713, 726, 731, 738, 744)), and that, aside from "his brief rehab stay," "the record does not include emergency, inpatient, or intensive outpatient services" supporting the disabling mental limitations opined by this provider (Tr. at 17). In addition, the ALJ cited Plaintiff's "broad range of daily activities" as inconsistent with Dr. Wurzelmann's opinions, explaining that,

> [Plaintiff] may not have done well in a hectic restaurant-type environment, but he has found less stressful environments doing part-time and volunteer work during the period at issue, including gardening, helping in a kitchen, and working with dogs. He lives alone, cares for his pet dog, cooks, and cleans his

> apartment. He appears to have few issues interacting with others, as he works out on a regular basis at the gym with a friend, attends fitness classes, plays the guitar with others, goes to coffee shops and bars, and gets along with his neighbors. [Plaintiff's] demonstrated ability to work at least part-time, care for himself, and interact with others is not consistent with Dr. Wurzelmann's opinions that [Plaintiff] is essentially unable to complete any activities.

(Tr. at 17) (citations omitted).

Plaintiff contends that the ALJ misrepresented or mischaracterized Dr. Wurzelmann's opined limitations and the supporting evidence. Notably, the nine-page Mental Impairment Questionnaire completed by Dr. Wurzelmann in September 2021 provides a detailed and nuanced account of Plaintiff's abilities, with extensive explanations for the findings, based on his five years as Plaintiff's treating psychiatrist. (See Tr. at 601-09.)[6] In evaluating this opinion, the ALJ found Dr. Wurzelmann's opined limitations unsupported by his treatment notes, because Plaintiff generally reported "doing well with no major concerns." (Tr. at 17.) However, both Dr. Wurzelmann's medical statement and his treatment notes explain that Plaintiff's lack of concern was actually a symptom of his schizophrenia. Specifically, Dr. Wurzelmann explained that Plaintiff "has limited insight into his illness and often doesn't think he has any psychiatric illness. A few years ago, I wrote him a letter to support his disability claim, but he refused to finish applying for disability because he felt he didn't have any problems." (Tr. at 609.) Instead, Dr. Wurzelmann noted, Plaintiff "typically floats from job to job, getting laid off after a few weeks to months due to frequent errors, inattentiveness, and

---

[6] The two-page functional questionnaire completed by Dr. Wurzelmann in September 2023 only allowed the provider to identify, via checkmark, areas in which Plaintiff had extreme or marked limitations. (Tr. at 804-05.) Lesser degrees of limitation, such as mild or medium, were not provided as options. (Tr. at 804-05.) Therefore, Dr. Wurzelmann was forced to choose between indicating that Plaintiff (1) had no limitations at all in a given area or (2) marked or extreme limitations. Given only these polarized choices, the provider was, by default, compelled to select the "extreme" limitations the ALJ later cited when finding the opinions unpersuasive. Plaintiff does not appear to object to this finding, given the flawed nature of the questionnaire itself.

general low performance due to lacking organizational ability." (Tr. at 609.) Dr. Wurzelmann further explained that Plaintiff struggled at work to keep up with tasks, is often told to work faster, "has a hard time following directions," and struggles to get to work on time. (Tr. at 604.) Dr. Wurzelmann noted that Plaintiff "was unable to finish high school" and that he "has struggled across his many different jobs. He is often slow, struggling to get things done in a timely manner, then supervisors put pressure on him, and he becomes stressed out." (Tr. at 605-06.) Dr. Wurzelmann added that Plaintiff "often drinks to relieve stress, which further impairs his functioning." (Tr. at 605.) As the ALJ noted, Plaintiff's drinking also led to a stay in rehabilitation facility during the relevant time period. (Tr. at 15.) In addition, when asked whether Plaintiff could manage benefits in his own interest, Dr. Wurzelmann stated that Plaintiff "struggle[s] to maintain a budget and has difficulty tracking where his money goes. When his mom puts money into his account, she notes [that] it rapidly disappears and he has no explanation for it. When I asked him about it, he was also unable to explain." (Tr. at 609.) Dr. Wurzelmann clarified that these difficulties, along with Plaintiff's significant and ongoing difficulty remembering instructions regarding medication changes and appointments, were symptoms of the extreme mental disorganization caused by schizophrenia itself. (See Tr. at 601, 602, 604, 606, 608.) These difficulties are specifically reflected in Dr. Wurzelmann's treatment notes, including Plaintiff's difficulty maintaining a job, his limited insight and inability to recognize his own cognitive disorganization, and his difficulty maintaining medication compliance and remembering appointments and instructions. (See Tr. at 617-19, 623-26, 629-32, 636-41, 643-48, 650-55, 657-662, 664-70, 674-80, 682-88, 694-705, 707-10, 731-36, 738-42, 744-48; 758-61.) Because the ALJ relied on Plaintiff's reports of "doing well"

15

to discount Dr. Wurzelmann's opinion, even though Plaintiff's lack of insight was itself a symptom of his schizophrenia, and because the ALJ did not address this issue or otherwise address the majority of Dr. Wurzelmann's supporting explanations, it is not clear that the ALJ adequately or accurately addressed the supportability and consistency of Dr. Wurzelmann's opinion.[7]

There are similar problems with the ALJ's assertion that Plaintiff's "broad range of daily activities is inconsistent with Dr. Wurzelmann's opinions." (Tr. at 17.) In particular, the ALJ found that Plaintiff's "demonstrated ability to work at least part-time, care for himself, and interact with others is not consistent with Dr. Wurzelmann's opinions that [Plaintiff] is essentially unable to complete any activities." (Tr. at 17.) However, this broad conclusion mischaracterizes both Dr. Wurzelmann's opinions and Plaintiff's activities. In Woods v. Berryhill, the Fourth Circuit explained that "[a]n ALJ may not consider the type of activities a claimant can perform without also considering the extent to which she can perform them." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis omitted); see also Lewis v. Berryhill, 858 F.3d 858, 868, n.3 (4th Cir. 2017) ("The ALJ points to Lewis' ability to perform incremental activities interrupted by periods of rest, such as 'driv[ing] short distances of up to

---

[7] The Court also notes that, from the explanation the ALJ did provide, it remains unclear whether he adequately considered Plaintiff's lack of medication compliance throughout much of the period, as described in detail in Dr. Wurzelmann's opinion and treatment notes, as a symptom of Plaintiff's schizophrenia. The ALJ repeatedly characterized Plaintiff's condition as improving when he was compliant with medications (Tr. at 13, 14, 15, 16), without considering the reason for noncompliance or the ongoing treatment records reflecting Plaintiff's confusion and inconsistency with medications. See Pate–Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009) ("[F]ederal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse" and "[c]ourts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of the rationality to decide whether to continue treatment or medication." (internal quotations omitted)); Preston v. Heckler, 769 F.2d 988, 990–91 (4th Cir. 1985).

16

30 miles, shop for groceries with the assistance of her mother or roommate, handle her finances, and watch television.' The ALJ's conclusion that Lewis' activities demonstrate she is capable of work is unsupported by the record.") (citation omitted); Brown v. Comm'r, 873 F.3d 251, 263 (4th Cir. 2017) ("[T]he ALJ noted that Brown testified to daily activities of living that included 'cooking, driving, doing laundry, collecting coins, attending church and shopping.' The ALJ did not acknowledge the extent of those activities as described by Brown, e.g., that he simply prepared meals in his microwave, could drive only short distances without significant discomfort, only occasionally did laundry and looked at coins, and, by the time of the second ALJ hearing, had discontinued regular attendance at church and limited his shopping to just thirty minutes once a week. Moreover, the ALJ provided no explanation as to how those particular activities—or any of the activities depicted by Brown—showed that he could persist through an eight-hour workday.") (citation omitted); see also Fletcher v. Colvin, No. 1:14CV380, 2015 WL 4506699 at *5-8 (M.D.N.C. July 23, 2015).

Here, the ALJ stated that Plaintiff could do "part-time and volunteer work during the period at issue, including gardening, helping in a kitchen, and working with dogs," and that he "lives alone, cares for his pet dog, cooks, and cleans his apartment." (Tr. at 17.) However, as in Woods, the ALJ failed to qualify the extent of Plaintiff's activities. Although no one lives with Plaintiff, his mother testified that she, along with Plaintiff's father and grandmother, pay all of Plaintiff's bills and deposit small amounts of money in his account to pay for food, gas, and other essentials. (Tr. at 69-70.) Plaintiff's mother also testified that she typically visits Plaintiff on at least a weekly basis, at which point she has to remind him to clean up after himself and take care of grooming activities such as showering and trimming his fingernails.

17

(Tr. at 69, 73.) When asked if she provides assistance regarding Plaintiff's daily medications, his mother stated that, "[f]or a long period [she] was going every day to . . . watch him physically take [his] medication, because . . . he was being way too casual." (Tr. at 70.) As noted above, this difficulty with treatment compliance—and compliance generally—is reflected repeatedly in Dr. Wurzelmann's treatment notes.

In terms of Plaintiff's ability to work and volunteer on a part-time basis, Plaintiff testified that he was fired from three jobs for working too slowly and having difficulty following instructions. (Tr. at 57.) This difficulty in maintaining employment is reflected in Dr. Wurzelmann's treatment records. (See Tr. at 617-19, 623-26, 629-32, 636-41, 643-48.) Plaintiff also clarified that "working with dogs" involves cleaning out kennels for about an hour a day and that he can take his own dog with him. (Tr. at 44-45, 64-65.) Further, the "two part-time jobs" relied upon by the ALJ—"one helping in a kitchen and the other gardening"—are only mentioned in Dr. Wurzelmann's treatment notes in February and March of 2023. (Tr. at 16, 17, 751, 758.) The ALJ failed to consider that the jobs in question were very limited and only lasted for a short time. Specifically, at his appointments in February and March of 2023, Plaintiff reported that he was "doing some gardening . . . just a few hours here and there a few days per week." (Tr. at 758.) At his March appointment, Plaintiff also reported that he had "restarted [a] part-time job working a few hours in a kitchen," which he found "less stressful than prior jobs." (Tr. at 764.) However, when questioned about work six months later at the administrative hearing, Plaintiff did not indicate that he continued to perform either the gardening or kitchen jobs, instead identifying only his work at the kennels. (Tr. at 44-45.) Accordingly, the evidence cited by the ALJ fails to support his finding that

18

Plaintiff had a "demonstrated ability to work at least part-time [and] care for himself," and fails to support the conclusion that Plaintiff could therefore work full time and that Dr. Wurzelmann's opinion was unsupported. (Tr. at 17.) Instead, the inconsistency and instability of Plaintiff's efforts to even work a few hours per week in limited or volunteer-type positions appears to provide further support to Dr. Wurzelmann's opinions. See Lewis, 858 F.3d at 869 ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." (internal quotation omitted)); Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir. 2020) (finding that the ALJ's decision was "unsupported by substantial evidence" where "the ALJ erred by [ ] selectively citing evidence from the record").

In light of these issues with respect to the consideration of Dr. Wurzelmann's opinion, and in light of the ALJ's failure to address material limitations included in the opinions of Dr. Kang and Dr. Parnell as discussed above, substantial evidence fails to support the ALJ's analysis and remand is required.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, that Defendant's Dispositive Brief [Doc. #11] be DENIED, that Plaintiff's Dispositive Brief [Doc. #10] be GRANTED, and that this action be REMANDED for further consideration in accordance with the directives set out herein.

This, the 19th day of August, 2025.

Joi Elizabeth Peake
United States Magistrate Judge